Alan Gura (SBN 178,221)
agura@ifs.org
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W.,
    Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:    202.301.3399

Attorneys for Plaintiffs
Matin Samimiat, Annaliese Hutchings,
and Young America's Foundation

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATIN SAMIMIAT, ANNALIESE HUTCHINGS, and YOUNG AMERICA'S FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> STEPHANIE SMALLSHAW, Director, Student Life and Leadership Development and College Disciplinary Officer, Golden West College, in her individual and official capacities, <br><br> Defendant. | Case No.: 8:25-cv-01098 <br><br> **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF** |

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as plaintiffs allege that defendant has violated and is violating 42 U.S.C. § 1983 by depriving them, under color of state law, of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

2.  This Court is the proper venue for this action per 28 U.S.C. § 1391(b) as a substantial part of the events and omissions giving rise to the claim have occurred and are occurring in this judicial district.

## INTRODUCTION

3.  Censorship is a cancer upon any society in the world. But at Golden West College, the censor might threaten students with expulsion for saying so, because it may hurt people impacted by cancer. Indeed, Golden West's chief censor, Defendant Stephanie Smallshaw, employed that logic to threaten students for calling illegal immigration a societal cancer.

4.  Likewise, declaring that "Hamas is a terrorist organization and they must be wiped from the face of the Earth" can end a Golden West student's academic career, because some students do not believe that Hamas is a terrorist organization, and such "offensive language" could supposedly encourage violence.

5.  However, "Go back to your f*cking country" is acceptable at Golden West, if directed at students who should know better than to use cancer metaphors or call for the eradication of terrorist organizations.

6.  Of course, there is no way for students to truly know what speech is or isn't covered under Golden West's disciplinary code. A fair guess is that politically conservative speech is risky. But in any event, Golden West's code is vague, overbroad, and discriminates based on viewpoint, all in violation of the First Amendment. Putting a stop to such policies at government schools is among this Court's most important functions.

## THE PARTIES

7.  Plaintiff Matin Samimiat is a student at Golden West College.

8.  Plaintiff Annaliese Hutchings is a student at Golden West College.

9.  Plaintiff Young America's Foundation ("YAF") is a nonprofit corporation whose mission is to educate the public on the ideas of

individual freedom, free enterprise, a strong national defense, and traditional values. YAF runs several educational and public service programs including Campus Lecture and Activism programs that bring conservative and liberty-minded points of view to American colleges and high schools, and the Young Americans for Freedom project, a membership organization open to full time students ages 13 and above which sponsors students and student groups on campus. YAF brings this action for itself, and on behalf of its members.

10.    Plaintiff Samimiat founded and currently serves as President of YAF's Golden West College chapter. Plaintiff Hutchings is the Vice President of YAF's Golden West College chapter and will succeed Samimiat as the chapter's president in the coming academic year. Both are members of Young Americans for Freedom and expect to continue their membership for several years.

11.    Defendant Stephanie Smallshaw is the Director of Student Life and Leadership Development, and College Disciplinary Officer, of Golden West College, a California community college operated by the state's Coast Community College District ("CCCD"). She is sued in her individual and official capacities.

STATEMENT OF FACTS

*The Regulatory Scheme*

12.    CCCD's governing board is required to "adopt or provide for the adoption of specific rules and regulations governing student behavior along with applicable penalties for violation of the rules and regulations." Cal. Educ. Code § 66300. It must "adopt procedures by which all students are informed of such rules and regulations, with applicable penalties, and any revisions thereof." *Id.*

13.    Accordingly, pursuant to state law, CCCD maintains Administrative Procedure 5500, "Student Code of Conduct," available at https://perma.cc/LA93-P766. A true and correct copy of excerpts of this Code is attached hereto as Exhibit A.

14.    The Code forbids "Hateful behavior aimed at a specific person or group of people," Code of Conduct, appx. B § 24; and "Infliction of Mental Harm," which includes "[i]nflicting mental harm upon any member of the District Community," "taking any reckless, but not accidental, action from which mental harm to member [sic] of the District Community could result," and "any act which purposefully demeans, degrades, or disgraces any person," *id.* § 27.

15.    Anyone may file a complaint alleging that a student has violated the Code with the College Disciplinary Officer for the appropriate school. *Id.* § 3.1. The College Disciplinary Officer then provides the parties notice, and provides the accused student seven days to schedule an initial meeting. *Id.* § 3.2.

16.    The College Disciplinary Officer may suspend an accused student from school, restrict the student from district facilities or events, or restrict the student's contact with others, on an interim basis pending further investigation and review. *Id.* § 3.3.

17.    The Code contemplates that an investigation follows the accused student's meeting with the College Disciplinary Officer, which should generally take no more than 90 days. *Id.* § 3.4. "The College Disciplinary Officer may act in the role of investigator." *Id.* The College Disciplinary Officer or Designee may then resolve the matter either through mediation or other form of alternative dispute resolution; informally, upon the student's admission of guilt and acceptance of any offered sanction; or by

a formal finding of "Not Responsible or "Responsible." *Id.* §§ 3.5, 3.6. The
standard of proof in all cases is preponderance of the evidence. *Id.* § 3.7.

18.    "[T]he College Disciplinary Officer shall then decide whether or
not to impose sanctions." *Id.* § 3.8. The Code provides a non-exclusive list
of potential sanctions, which include community service, disciplinary
probation subject to conditions imposed by the College Disciplinary
Officer, restrictions on access to parts or areas of the District or District
property, exclusion from activities, the writing of an "educational essay,"
mental health clearance, restitution, restriction from attending events,
written warning, suspension and expulsion. *Id.* § 3.8 and appx. C.
However, with respect to expulsion, the College Disciplinary Officer's role
is to initiate a process by which the Chancellor may expel the student
upon the President's recommendation. *Id.* §§ 6.1-6.3.

19.    Decisions imposing community service, disciplinary probation,
the requirement to obtain mental health clearance, short term removal
from class, record holds, written warnings, and completion of an
educational assignment or project are not appealable. *Id.* § 4.1.

*Golden West Resists the YAF Chapter*

20.    Matin Samimiat recently celebrated his second year as an
American citizen. Having emigrated to the United States from Iran,
Samimiat deeply appreciates his constitutionally guaranteed freedoms.
He holds generally conservative political views, which he believes are
vastly underrepresented on campus. Samimiat was thus motivated to
found a YAF chapter at Golden West College, so that he could better
promote, express, and defend those views. He also wanted to listen to and
engage with others to explore new ideas and have his own views tested.

21.    Annaliese Hutchings tends to share Samimiat's political outlook.
She, too, is interested in promoting, expressing, and defending

conservative American political values, as well as listening to and engaging with others to explore new ideas and have her own views tested. Hutchings looks forward to leading the YAF chapter at Golden West in the coming academic year, upon Samimiat's graduation.

22.    Golden West College allows students to obtain official recognition for their clubs and organizations. Official recognition affords student clubs and organizations a variety of benefits, including use of the college's name and branding for approved events, activities, and programs; assistance from the school's Campus Life office in supporting events and activities; use of campus facilities and equipment; a club account at the Bursar's Office; computer, internet, and printer access; participation in Campus Life activities, events, programs, conferences, and field trips; 100 flyers per semester; large format color printing; funding for the club's activities; and access to office supplies. *See* Golden West College, *Student Clubs and Organizations Handbook*, https://perma.cc/QZ4R-3CZT, at 2. A true and correct copy of excerpts of this handbook is attached hereto as Exhibit B.

23.    Accordingly, in October, 2024, Samimiat sought official recognition of the YAF chapter. At the time, clubs needed to satisfy three criteria to gain official recognition: the club founders were required to fill out an application form identifying the club's purpose and providing contact information, recruit at least five initial members, and identify a Club Advisor, who can be any full or part-time faculty member, full-time classified Golden West College professional, or any Golden West College manager or administrator. The rules provided that any club meeting the three requirements noted above was considered a "Developing Club," which would appear on the agenda for approval at the next meeting of the Inter-Club Council ("ICC").

24.    Samimiat faced strong resistance in gaining official recognition for the YAF chapter.

25.    Samimiat appeared before the ICC at its October 22, 2024, meeting, at which his application for recognition of the YAF chapter was on the agenda. Samimiat explained YAF's purpose and function, and discussed conservative principles and the need to create a campus space for conservative students. Samimiat also related his experience escaping the tyrannical Iranian regime and emigrating to America, and emphasized his desire to spread love and appreciation for America's freedoms, our God-given free will, and constitutionally guaranteed rights.

26.    The ICC was generally hostile to Samimiat's presentation. One club representative suggested that YAF's speech could hurt others, but the ICC Vice President cut short Samimiat's attempt to defend his right of free speech. Other club representatives expressed opposition to YAF's pro-life positions, and its sponsorship of speakers who allegedly "have put trans people in harm's way and have promoted White nationalism."

27.    The ICC rejected Samimiat's application 15-4. Dennis Nañez, the school's Student Life and Leadership Specialist, then informed Samimiat that because his first application was rejected, a subsequent application would require two-thirds of the vote for approval.

28.    Nañez invited Samimiat to a meeting on October 24, 2024, at which they were joined by Smallshaw. The two college administrators expressed a desire to see the YAF club approved, and admitted that they had not seen a club meeting the recognition requirements rejected. Smallshaw stated that she would attend the next ICC meeting to facilitate any discussion, and explain the supposed differences between free speech and "hate speech." Samimiat protested that there is no such thing as "hate speech," that free speech guarantees him the right to say

things others dislike, but Smallshaw appeared unmoved. She urged
Samimiat to make YAF appear less political. Criticizing communism, for
example, could be viewed as "too political."

29. Samimiat attended the November 5, 2024, ICC meeting, hoping
to advocate for his club's recognition. However, Smallshaw met Samimiat
at the meeting, and told him that she and Nañez decided not to include
the YAF chapter's recognition request on the agenda because that day was
also election day, and political tensions were running high.

30. Golden West College's Director of Public Safety addressed the
ICC, and explained that as a constitutional matter, there is no such thing
as hate speech, and that all people have the right to say what they wish so
long as they are not causing an immediate danger or imminently inciting
violence. Smallshaw then addressed the ICC, and explained that when
considering a club's recognition request, ICC members only vote on
whether the club has met the three requirements: a complete application,
advisor, and five members.

31. Samamiat met Smallshaw and Nañez on November 14, 2024, at
their request. Smallshaw then claimed that recognition of Samamiat's
YAF chapter would be delayed again, pending revisions to the student
club handbook. Although Smallshaw believed that the rules afforded the
ICC no discretion to deny recognition of a club meeting the stated
requirements, ICC members believed differently, and Smallshaw thought
it best to suspend all new club activations for the semester so that the
rules could be clarified.

32. Samamiat complained that "a little band of student tyrants get to
decide everything based on their preferences," to which Smallshaw
responded by threatening Samamiat with discipline for name-calling.

1

*Smallshaw threatens to punish students for their speech*

2    33.   On February 3, 2025, Golden West College revised its Student

3  Clubs and Organizations Handbook. The school added a fourth

4  requirement for club recognition, that the club submit its constitution.

5  The revised rules now provide:

6      Once you have completed all four steps listed above. [sic] Your club will
       be ratified at the next eligible ICC meeting during the Fall or Spring
7      semester. After your club is ratified, it will be considered an "Active
       Club."
8
       Ratification is solely based upon completion of the 4 required steps
9      listed above. Any personal views and opinions about student groups are
       not considered when ratifying a student club or organization.
10
  Handbook at 6.
11
12    34.   Ahead of the next vote on the YAF chapter's recognition,

13  Samimiat and Hutchings tabled at the Club Expo event on behalf of their

14  YAF chapter. "Club Expo is ICC's signature event, hosted every fall and

15  spring semester. Club Expo provides each student group an opportunity to

16  showcase their club or organization to the larger GWC student body and

17  to recruit new and returning students to join your membership."

18  Handbook at 14. "All active clubs, including new interest groups seeking

19  official club activation, are eligible to participate in Club Expo." *Id.*

20    35.   On Club Expo's first day, February 25, 2025, the students tabled

21  at "The Quad," an open area in front of the school's Student Services

22  Center. Golden West provided clubs a table, two chairs, and a canopy, on

23  a first-come first-served basis.

24    36.   Samimiat and Hutchings sought to recruit members, promote

25  their views, and engage in political debate with interested passersby.

26  They used supplies provided by YAF, including posters, pins, booklets,

27  stickers and the like to decorate their table and booth. Samimiat had also

28  printed a recruitment poster with a QR code for new members, and used

funds provided clubs by Golden West to purchase a whiteboard and stand, and a Gadsden flag.

37.    To that end, they displayed the whiteboard with various political posters and messages. The whiteboard read:

CHANGE MY MIND!!!

- It is a privilege to be an American and we should all be thankful for it.
- Illegal immigration is a cancer upon any society in the world.
- Men do not belong in women's sports and spaces.



38.    Samimiat and Hutchings again tabled on the second day of Club Expo, February 26, 2025, which Golden West College held on its Stem Center Patio, using the same setup.

39.    On March 7, 2025, Smallshaw emailed Samimiat, "My office received several reports regarding Club Expo and some messaging on a white board at your booth. I would like to schedule a meeting so that we can discuss." Samimiat accordingly scheduled the meeting for March 20, 2025.



40. In the meantime, Samimiat and Hutchings also used this setup to table at Golden West's "Goldchella" college preview day event, held March 13, 2025, on "the Main Street," a walkway between the Student Services Center and bookstore/cafeteria. On this day, Plaintiffs' whiteboard read:

- Being an American is a privilege and we should all be thankful for it.

- Illegal immigration is a cancer upon any society in the world.

- Men do not belong in women's sports and spaces.

- Hamas is a terrorist organization, and they must be wiped from the face of the earth.



41.    Plaintiffs succeeded in recruiting members, and overall found the tabling experiences to be positive. Of course, not everyone was pleased with YAF's message. While Samimiat was engaged in a debate with two other students over illegal immigration, using his own experiences as a naturalized citizen, a passerby yelled at Samimiat, "Go back to your f*cking country!" A member of the Gender, Love, Acceptance, Sexuality Alliance (GLASA) screamed at Samimiat for saying that children should not be exposed to pride messages.

42.    On March 20, 2025, Samimiat and Hutchings met with Smallshaw. Smallshaw advised that the meeting was informal, and not an official disciplinary meeting, but nonetheless was meant to serve as a "courtesy warning." Recounting that she had received numerous reports complaining about YAF's whiteboard, Smallshaw said that plaintiffs would be subject to discipline if they kept writing those sort of statements on their whiteboard. Specifically, Smallshaw took exception to the statements regarding illegal immigration and Hamas.

43.    With respect to plaintiffs' statement that "illegal immigration is a cancer upon any society in the world," Smallshaw declared, "You can't use language that dehumanizes a group of people and compares them to a deadly disease. It can also be harmful to people who have experienced cancer with their loved ones."

44.    With respect to plaintiffs' statement that "Hamas is a terrorist organization, and they must be wiped from the face of the earth," Smallshaw declared, "You can't use language that can incite violence and encourage the killing of a group of people."

45.    Referencing the "group of people," Samimiat offered a correction: "terrorist organization." To this, Smallshaw responded, "No, that's your opinion," and a debate ensued between the two. Smallshaw concluded by

saying, "Some students here believe Hamas is not a terrorist organization, and you need to stop using such offensive language that could potentially encourage violence."

46. Samamiat responded, "that is precisely why it is important to educate other students who are clueless when it comes to this topic by having them engage with this topic, because," referencing his upbringing in Iran, "I doubt any of the reporters nor you have spent 18 years in the country that is the biggest supporter of Hamas."

47. Considering Smallshaw's position, Samimiat asked her how he might track down and report those who came to the YAF table and screamed unhinged, uncivilized, and direct personal attacks at him, including vulgarities and "Go back to your f*cking country." Smallshaw responded that those people would not have acted like that if the YAF whiteboard had not displayed such provocative language that triggered them.

48. Samamiat offered that the YAF table probably had the most engagement during Club Expo, demonstrating students' hunger to engage with difficult topics that they cannot engage with in other places. Samimiat stated that he sees it as his duty to create an environment for young students to engage with difficult topics, and that if adults in a college cannot learn how to handle tough discussions and disagreements, then they are going to have a difficult path ahead of them. Smallshaw became agitated and said, "That is not your responsibility."

49. Throughout the discussion, Samimiat offered to change his language, though not YAF's positions, but Smallshaw offered no assurances as to what type of changes might secure YAF and its members from discipline. Samimiat offered that the complaints against YAF would never cease, because some people object to the group's presence and its

1  views regardless of the language it employs. Smallshaw could only state

2  that if YAF undertook appropriate and considerable changes in its

3  rhetoric, she would dismiss future complaints.

4      50.    On March 25, 2025, the ICC finally granted YAF's Golden West

5  chapter official recognition. However, at several ICC meetings following

6  the YAF chapter's official recognition, students addressed the ICC during

7  the public comment period to protest the YAF chapter's recognition. The

8  complaining students accused YAF of creating a hostile environment for

9  people of color, triggering and irritating others, being hateful towards

10  LGBT people, and the like. Following the first such comment, Smallshaw

11  told the students that they should use official channels to report any

12  hateful behavior, and that she would review such complaints and take any

13  appropriate action.

14              *The Continuing Impact on Plaintiffs' Speech*

15      51.    Owing to Smallshaw's threats, and to the existence of the

16  disciplinary code, Samimiat and Hutchings have stopped their advocacy

17  on behalf of YAF.

18      52.    Plaintiffs intend to continue expressing their conservative

19  political views—including their opposition to illegal immigration, Hamas,

20  and gender ideology. And they intend to continue expressing themselves

21  politically using the full, rich range of the English language, including the

22  use of cancer metaphors, such as calling illegal immigration a cancer, and

23  calling for the eradication of Hamas and other terrorist groups. They

24  intend to table, to distribute literature, to host speakers, organize debates,

25  and otherwise do whatever they can to participate in civic life at Golden

26  West College to advance their political views and YAF's mission. Plaintiffs

27  also intend to continue recruiting student members, including future

28  leaders who would continue and perpetuate YAF's Golden West chapter.

53.    However, Plaintiffs refrain from doing any of these things for fear of having disciplinary proceedings initiated against them, and for being sanctioned under the Student Disciplinary Code, owing to Smallshaw's threats and to the continuing existence of the Code's prohibition of "hateful behavior aimed at a specific person or group of people," Code of Conduct, appx. B § 24; and "infliction of mental harm," including "inflicting mental harm upon any member of the District Community," "taking any reckless, but not accidental, action from which mental harm to member [sic] of the District Community could result," and "any act which purposefully demeans, degrades, or disgraces any person," *id.* § 27.

54.    Plaintiffs are unsure as to what speech, exactly, would land them in trouble with Smallshaw or any other College Disciplinary Officer under the Code, as they cannot guess as to where officials would draw the line as to what is "hateful," what constitutes a "group of people," what counts as "infliction of mental harm," and what language "demeans, degrades, or disgraces any person" in an official's view. They are, however, convinced that their political advocacy would continue to generate complaints under the disciplinary code, and that there is a real risk, given Smallshaw's threats, that sooner rather than later, they would be disciplined for their speech.

55.    Accordingly, Samimiat and Hutchings remain silent. And under these conditions, YAF cannot recruit future leaders to sustain its Golden West chapter after Samimiat and Hutchings graduate. Defendant's threats thus continue to injure YAF indefinitely.

56.    Hutchings expects to remain a student at Golden West College for at least another year, and so she will continue to be directly impacted by the unconstitutional speech restrictions for at least that long. Samimiat expects to graduate from Golden West at the end of May, 2025. Not

wishing to jeopardize his impending graduation and transfer, Samimiat has been especially keen on steering clear of disciplinary problems under Defendant's speech code. However, Defendant's code and practices will continue to injure Samimiat, as Hutchings and YAF would refrain from hosting him at Golden West College as a speaker, considering that Smallshaw has already threatened discipline over his expression.

57.    Barring relief from this Court, Plaintiffs will continue to refrain from political advocacy at Golden West College, and YAF's Golden West chapter will be forced to close.

COUNT I
CONTENT AND VIEWPOINT DISCRIMINATION – FACIAL CHALLENGE
CCCD STUDENT CODE OF CONDUCT APPX. B §§ 24, 27
U.S. CONST. AMEND. I, 42 U.S.C. § 1983

58.    Plaintiffs reallege and incorporate paragraphs 1 through 57 of this complaint.

59.    "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (citations omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted).

60.    A law engages in content-based discrimination if, in regulating speech, it "draws distinctions based on the message a speaker conveys." *Id.* (citation omitted). Laws do so, and are subject to strict scrutiny, if they "defin[e] regulated speech by particular subject matter," or "by its function or purpose." *Id.* at 163-64.

61.    Viewpoint discrimination is "an egregious form of content discrimination," which occurs when the government targets "particular

views taken by speakers on a subject." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

62.    CCCD Student Code of Conduct, Appx. B §§ 24 and 27 discriminate against speech based on its content, as they define regulated speech according to its particular subject matter, function, and purpose. These provisions also discriminate against speech based on viewpoint.

63.    CCCD lacks a compelling state interest in prohibiting "hateful behavior aimed at a specific person or group of people," Student Code of Conduct, appx. B § 24; and "infliction of mental harm," *id.* § 27.

64.    CCCD Student Code of Conduct, appx. B, §§ 24 and 27, are not narrowly tailored to achieving any compelling state interest.

65.    To the extent that CCCD Student Code of Conduct, appx. B, §§ 24 and 27, govern limited public forums opened for the purpose of facilitating speech by Golden West College students promoting their clubs and organizations, these provisions are not reasonable in light of such a purpose.

66.    By threatening to enforce and enforcing the prohibitions on "hateful behavior aimed at a specific person or group of people," Student Code of Conduct, appx. B § 24; and "infliction of mental harm," *id.* § 27, Defendant, under color of law, deprived and continues to deprive Plaintiffs, their members, and their audience, of their right of free speech guaranteed by the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages, declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendant's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT II

CONTENT AND VIEWPOINT DISCRIMINATION – AS-APPLIED CHALLENGE
CCCD STUDENT CODE OF CONDUCT APPX. B §§ 24, 27
U.S. CONST. AMEND. I, 42 U.S.C. § 1983

67.    Plaintiffs reallege and incorporate paragraphs 1 through 57 of this complaint.

68.    Club Expo and Goldchella are limited public forums set aside by CCCD for expressive activity by Golden West College students promoting their clubs and organizations.

69.    CCCD Student Code of Conduct, appx. B, §§ 24 and 27, together and separately, unconstitutionally discriminate based on content and viewpoint when applied to prohibit Plaintiffs from employing cancer metaphors, including by declaring that "illegal immigration is a cancer upon any society in the world;" or declaring that "Hamas is a terrorist organization, and they must be wiped from the face of the earth." Nor are such applications of these provisions reasonable in light of the purposes of Club Expo and Goldchella.

70.    By threatening to enforce and enforcing the prohibitions on "hateful behavior aimed at a specific person or group of people," Student Code of Conduct, appx. B § 24; and "infliction of mental harm," *id.* § 27, against Plaintiffs' statements that "illegal immigration is a cancer upon any society in the world" and "Hamas is a terrorist organization, and they must be wiped from the face of the earth," Defendant, under color of law, deprived and continues to deprive Plaintiffs, their members, and their audience, of their right of free speech guaranteed by the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages, declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendant's

unconstitutional customs, policies, and practices; and attorney fees and
expenses pursuant to 42 U.S.C. § 1988.

COUNT III
VAGUENESS
U.S. CONST. AMEND. I, XIV; 42 U.S.C. § 1983

71.    Plaintiffs reallege and incorporate paragraphs 1 through 57 of
this complaint.

72.    The First and Fourteenth Amendment prohibit vague laws that
chill protected speech. A law can be "impermissibly vague for either of two
independent reasons" under the First Amendment. *Hill v. Colorado*, 530
U.S. 703, 732 (2000) (citation omitted). "First, if it fails to provide people
of ordinary intelligence a reasonable opportunity to understand what
conduct it prohibits. Second, if it authorizes or even encourages arbitrary
and discriminatory enforcement." *Id.*

73.    CCCD's prohibition of "hateful behavior aimed at a specific
person or group of people," Code of Conduct, appx. B § 24; and "infliction
of mental harm," including "inflicting mental harm upon any member of
the District Community," "taking any reckless, but not accidental, action
from which mental harm to member [sic] of the District Community could
result," and "any act which purposefully demeans, degrades, or disgraces
any person," *id.* § 27, are unduly vague and are inherently subjective,
serving only to authorize school officials' arbitrary censorship of speech
they dislike. This policy is unconstitutionally vague and gives school
officials excessive enforcement discretion.

74.    By threatening to enforce and enforcing the prohibitions on
"hateful behavior aimed at a specific person or group of people," Student
Code of Conduct, appx. B § 24; and "infliction of mental harm," *id.* § 27,
Defendant, under color of law, deprived and continues to deprive
Plaintiffs, their members, and their audience, of their right of free speech

1  guaranteed by the First and Fourteenth Amendments to the United

2  States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C.

3  § 1983, and are therefore entitled to damages, declaratory and

4  preliminary and permanent injunctive relief against continued

5  enforcement and maintenance of Defendant's unconstitutional customs,

6  policies, and practices; and attorney fees and expenses pursuant to 42

7  U.S.C. § 1988.

8                              COUNT IV
                            OVERBREADTH
9              U.S. CONST. AMEND. I; 42 U.S.C. § 1983

10     75.    Plaintiffs reallege and incorporate paragraphs 1 through 57 of

11  this complaint.

12     76.    Speech regulations may not "sweep unnecessarily broadly and

13  thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377

14  U.S. 288, 307 (1964) (citation omitted). "The showing that a law punishes

15  a substantial amount of protected free speech, judged in relation to the

16  statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of

17  that law, until and unless a limiting construction or partial invalidation

18  so narrows it as to remove the seeming threat or deterrence to

19  constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113,

20  118-19 (2003) (internal quotation marks and citations omitted) (emphasis

21  original).

22     77.    The prohibitions on "hateful behavior aimed at a specific person

23  or group of people," Student Code of Conduct, appx. B § 24; and "infliction

24  of mental harm," *id.* § 27, empower Defendant to censor any speech that

25  she subjectively considers offensive. These rules are not confined to

26  prohibiting unprotected speech, such as true threats. Rather, they ban all

27  speech that the College Disciplinary Official finds offensive or derogatory,

28

even when the speech is protected by the First Amendment and concerns matters relevant to the purpose of the forum where it was expressed.

78.    The prohibitions on "hateful behavior aimed at a specific person or group of people," Student Code of Conduct, appx. B § 24; and "infliction of mental harm," *id*. § 27, violate the First Amendment right of free speech on its face because they are substantially overbroad, sweeping in vast amounts of protected political expression.

79.    By threatening to enforce and enforcing the prohibitions on "hateful behavior aimed at a specific person or group of people," Student Code of Conduct, appx. B § 24; and "infliction of mental harm," *id*. § 27, Defendant, under color of law, deprived and continues to deprive Plaintiffs, their members, and their audience, of their right of free speech guaranteed by the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages, declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendant's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Matin Samimiat, Annaliese Hutchings, and Young America's Foundation request that judgment be entered in their favor as follows:

A.    Orders preliminarily and permanently enjoining Defendant, her officers, agents, servants, employees, and all persons in active concert or participation with her who receive actual notice of the injunction, from:

1. enforcing CCCD Student Code of Conduct appx. B § 24, prohibiting "hateful behavior aimed at a specific person or group of people," and CCCD Student Code of Conduct appx. B § 27, prohibiting the "infliction of mental harm;" and

2. enforcing CCCD Student Code of Conduct appx. B § 24, prohibiting "hateful behavior aimed at a specific person or group of people," and CCCD Student Code of Conduct appx. B § 27, prohibiting the "infliction of mental harm," against Plaintiffs' statements that "illegal immigration is a cancer upon any society in the world" and "Hamas is a terrorist organization, and they must be wiped from the face of the earth;"

B.  Declaratory relief consistent with the injunction, to the effect that CCCD Student Code of Conduct appx. B § 24, prohibiting "hateful behavior aimed at a specific person or group of people," and CCCD Student Code of Conduct appx. B § 27, prohibiting the "infliction of mental harm;" are unconstitutional on their face and as-applied to Plaintiffs' speech declaring that "illegal immigration is a cancer upon any society in the world" and "Hamas is a terrorist organization, and they must be wiped from the face of the earth;"

C.  Nominal damages in the amount of $17.91;

D.  Costs of suit;

E.  Attorney's fees and expenses pursuant to 42 U.S.C. § 1988; and

F.  Any other relief as the Court deems just and appropriate.

1    Dated: May 21, 2025          Respectfully submitted,

2
                                  By:    /s/ Alan Gura
3                                        Alan Gura (SBN 178,221)
                                         agura@ifs.org
4                                        INSTITUTE FOR FREE SPEECH
                                         1150 Connecticut Avenue, N.W., Suite 801
5                                        Washington, DC 20036
                                         Phone: 202.967.0007
6                                        Fax:    202.301.3399

7                                        Attorneys for Plaintiffs
                                         Matin Samimiat, Annaliese Hutchings,
8                                        and Young America's Foundation

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint                                23